## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **EDNA EARSERY-BROWN, in her individual capacity as the SISTER and wrongful death heir of GEORGE EARSERY, DECEDENT, and as soon to be appointed adminsitrator of the Estate of GEORGE EARSERY**<br>9819 Westminster Dr.<br>Humble, TX 77338 | **Case No.:** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| v. | |
| **WICHITA MEDICAL INVESTORS, LLC D/B/A LIFE CARE CENTER OF WICHITA**<br>**Serve RA:**<br>Corporate Service Company<br>1100 SW Wanamaker Rd. Suite 103<br>Topeka, KS 66604 | |
| **LIFE CARE CENTERS OF AMERICA**<br>Serve RA:<br>CSC-LAWYERS Incorporating Service Company<br>221 Bolivar St.<br>Jefferson City, MO 65101 | |
| **Defendants.** | |

## PLAINTIFF'S COMPLAINT FOR DAMAGES

By and through undersigned counsel, Plaintiffs submit this Complaint for Damages ("Complaint") against the above-named Defendants, and in further support, states and alleges as follows:

### PLAINTIFF

1.    Edna Earsery-Brown ("Plaintiff") is a surviving sister of George Earsery.

2.      George Earsery died on July 17, 2023, from dysphagia caused by an avoidable choking accident sustained at Wichita Medical Investors, LLC d/b/a Life Care Center of Wichita.



3.      Decedent George Earsery ("Resident") was a citizen of the state of Kansas at the time of his death.

4.      Plaintiff is and at all times relevant was an adult over the age of 21 and a citizen of the state of Texas.

## DEFENDANT

5.      Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### WICHITA MEDICAL INVESTORS, LLC D/B/A LIFE CARE CENTER OF WICHITA

6.      At all times relevant, Wichita Medical Investors, LLC ("Facility"), was a Kansas limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Life Care Center of Wichita which is a Kansas licensed nursing home located at 22 N Edgemoor Street Wichita, KS 67208.

7.      As such, Facility was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

8.     Consequently, Facility, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

9.     The sole member of Wichita Medical Investors, LLC is Forrest Preston.

10.     Forrest Preston is a citizen on Tennessee.

### LIFECARE CENTERS OF AMERICA, INC

11.     Lifecare Centers of America, Inc., a is Tennessee company with its principal place of business in Tennessee.

12.     Thus, Lifecare Centers of America, Inc., is a citizen of Tennessee.

13.     At all times relevant to this action, Defendant Lifecare Centers of America was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

14.     At all times relevant, Lifecare Centers of America, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

15.     Lifecare Centers of America, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a.  Staffing budgets;

    b.  The development and implementation of nursing policies and procedures;

    c.  The hiring and firing of the Administrator; and

    d.  Training and supervising nursing staff persons.

16.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

## JURISDICTION AND VENUE

17.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

18.    A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Kansas, thereby making venue proper.

19.    Defendants, purposefully availed themselves of the protections and/or benefits of the laws in Kansas by committing tortious acts within the state including, but not limited to, failing to ensure that Facility had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

20.    Plaintiff brings her claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

## FACTUAL BACKGROUND

21.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### Defendants' Treatment of Resident

22.    Resident was admitted to the Facility for skilled nursing care.

23.    Upon admission, Resident was or should have been identified as being at risk for choking.

24.    As early as November 15, 2019, the Facility was on notice of Resident's condition and was conducting "Swallowing Ability and Function Evaluation" tests on Resident.

25.    Upon information and belief Resident had a feeding tube.

26.    In January of 2020 Resident was in fact noted to be at risk for aspiration.

mmary: Scope was easily passed through (R) nare. Pt was cooperative but needed cues to keep head neutral. Pt has difficulty c coughing/breathing. Very wheezy cough. Does better c inhale through nose to calm breathing. Pt demonstrates delay in initiating swallow. Both puree and nectar fill vallecular before initiating swallow. Intermittant over spill c larger bites/drinks. Pt began coughing which triggered small reflux This is risky for aspiration. Recommend puree/nectar but use a regulator straw to control rate/quantity.

27.    In April of 2020 Resident was to be on a mechanical soft diet.

Evaluation: ☐ Modified barium swallow    ☐ Fiberoptic endoscopic evaluation of swallowing    ☐ Other Diag
Diet:    ☐ NPO    ☐ NPO pending further evaluation    ☐ Supervised/
☒ Continue current diet    ☒ Diet Modification mech. soft    ☐ No thin liq
☐ Reduced bolus size    ☐ Thicken liquids to _____ consistency    ☐ Other _____

Rehabilitation Recommendations and Potential

28.    In March of 2023, Resident had "several episodes of choking and coughing at meals.

> Seen resting upright in a chair on RA, no complaints. Staff reports several episodes of choking and coughing at meals. He was previously recommended NPO, but signed a waiver for pleasure feedings. Discussed downgrading diet to pureed vs NPO. He would like to continue pleasure feedings, but agreed to pureed diet.

29.    In April of 2023, Resident agreed to change his diet to mechanical soft due to repeated episodes of choking.

> Resting upright in his WC on RA. He tested positive for COVID-19 this morning. Having only mild symptoms including a cough and fatigue. He normally has a chronic wet cough at baseline, no worse today. No fever, chills, SOA. He is unable to take available OP treatment due to needing his pills crushed. Otherwise he is doing well. He recently agreed to downgrade his diet from regular to mechanical soft due to repeated episode of choking

30.    Resident's DPOA, Plaintiff Edna Earsery-Brown, adjusted his diet to strict NPO with enteral nutrition through the PEG tube.

> Dysphagia: January 2022 discharged from VCSF NPO on TF QID. 2/1/22 failed FEES. inpatient stay Nov 2022 continue NPO and TF. He had later signed a waiver to allow for comfort eating. 11/2022: decreased cognition, his DPOA (sister) adjusted his plan back to strict NPO with enteral nutrition through PEG tube. Dec 2022 after family care plan meeting restarting comfort eating.
>
> • March 2023 Downgraded to mechanical soft and thin liquids after several episodes of choking on regular diet. ST still recommending NPO.

31.    On May 8, 2023, Resident was to be strictly on tube feeding.

> Today 5/8/23 he is seen resting upright in his WC on RA feeling well, no complaints. Seen for a follow up on routine labs from his regulatory visits last week. Results were discussed with resident. Potassium is mildly elevated. He is not on any ACE-I/ARB or K+ Sparing diuretics. Over the past several months his dysphagia has progressed and he is now strictly on TF. Discussed with nursing to switch TF to nepro. Cr is also slightly elevated today, planning to increase free water flushes. Hgb is down 1G from Feb 2022. No S/S of bleeding.

32.    Resident had an episode of choking on May 16, 2023.

33.    As of June 29, 2023, Resident was to be NPO on a tube feeding diet.

today 6/29/23 he is seen resting upright in bed on RA. Due for a 60 day regulatory visit.
Since his last visit he was hospitalized for pneumonia. He has since recovered and is now
NPO on a TF diet. Since his return to LTC he has been spending more time in bed. He was
previous up in his WC everyday participating in group activities. His PHQ-9 score has
increased from 1/27 in Dec 2022 to 5/27 June 2023

34.     On the Resident's readmission paperwork to the Facility on June 1,

2023, Facility staff falsely noted that Resident had not chewing or swallowing issues.

**C.    Chewing/Swallowing Status**

Chewing/Swallowing Status

a.  ☐  Complaints of difficulty or pain when chewing
b.  ☐  Complaints of difficulty or pain when swallowing
c.  ☐  Coughing or choking during meals or when swallowing medications
d.  ☑  No chewing or swallowing issues evident at this time.

| Signed By | Signed Date |
| --- | --- |
| Charlene Johnson, LPN [e-SIGNED] | 06/01/2023 |

7

| 2. | Diet/Snack Orders | |
|---|---|---|
| A. | Diet and Snack Orders | |

1. Diet
    ☑ i. NPO
2. **Texture:**
    ☑ f. NPO
3. **Liquid consistency:**
    ☑ f. NPO
4. Fluid restriction:
    ◉ b. No
5. Portion size regular for all meals:
    ◉ a. Yes
6. Fortified Foods
    ◉ b. No
    **Special Feeding Equipment**
7. Special feeding equipment:
    ◉ b. No

| Signed By | Signed Date |
|---|---|
| Anna Lavender, Registered Dietician [e-SIGNED] | 06/03/2023 |

| 3. | Medical Nutrition Support |
|---|---|

35.    On that same readmission paperwork Facility staff noted that Resident was required total assistance with eating.

### 4. Eating
    ◉ e. Total Assistance

36.    On July 12, 2023, Resident was known to need assistance with eating.



37.    The Facility staff should have initiated a Care Plan to address Resident's risk for choking but did not implement the appropriate interventions.

38.    During Resident's time at the Facility, none of the Facility staff:

a. Properly assessed Resident's risk of choking;

b. Implemented or provided the appropriate interventions to prevent Resident from choking or allowing Resident's condition to get worse;

c. Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

d. Monitored Resident's condition, including Resident's condition.

39.    At no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants or any other staff member ever provide any sort of in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of choking in residents like Resident.

40.    At no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants or any other staff member ever implement the appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of choking in residents like Resident.

41.    While Resident was a resident at the Facility, the Facility did not have an adequate number of staff working daily at the Facility to meet Resident's needs, perform the interventions required to prevent Resident's avoidable choking or prevent the progression of Resident's condition, or monitor and adequately supervise Resident's condition.

## Management of the Facility

42.    Lifecare Centers of America, controls decisions including setting budgets, determining staffing levels, promulgating infection control policies, and accepting resident admissions.

43.    Lifecare Centers of America, controls the Facility by setting their staffing levels, choosing, and paying vendors including laboratories that process resident testing, and hiring and firing key personnel. As such, the Facility's administrators lack authority to make significant decisions relating to resident care.

44.    Lifecare Centers of America's control over the Facility violates Kansas State regulations that vest the nursing home administrator—the individual who is on the ground in the facility, with the residents and staff—with the responsibility of managing the Facility and making decisions in the best interests of the nursing home's residents.

45.    Although Lifecare Centers of America, purports to be a mere consulting company consulting with the Facility, Lifecare Centers of America, had knowledge of and control over the Facility's operations.

46.    Their knowledge extended to, among other issues, staffing crises, violations of infection control protocols, and resident neglect and harm. That knowledge stemmed from multiple sources, including communication from the Facility's administrators and DONs, DOH survey deficiency citations, poor scores on federal nursing home quality measures and metrics, and the findings of the Facility's quality assurance committees.

47.    The Facility's administrators and DONs regularly communicated with Lifecare Centers of America, about day-to-day operations at the facilities, including about budget, staffing numbers, hiring, admissions, CMS Star Ratings, DOH surveys and deficiencies, and CNA documentation rates.

48.    Defendants' decision to do so leaves the employees in Facility powerless to improve patient care.

49.    Lifecare Centers of America, controls, among other things, staffing budgets, admissions, and purchasing decisions.

50.    Defendants repeatedly and persistently delegated, and continue to delegate, complete control over the Facility.  Indeed, Lifecare Centers of America, controls virtually every element of the Facility's operations.

51.    The administrator at the Facility does not have control over the home's books and records; Lifecare Centers of America, handles that exclusively.  For instance, Lifecare Centers of America, prepares the Facility's Cost Reports and quarterly and annual financial statements.

52.    Lifecare Centers of America, develops and establishes the staffing levels for each nursing discipline on each shift at the facilities through the implementation of a staffing budget. Lifecare Centers of America, then closely monitors the staffing levels to ensure that the Nursing Homes stay within the budgets that Lifecare Centers of America, sets.

**Undercapitalization/Underfunding at the Facility**

53.     Facility and Lifecare Centers of America had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

54.     Facility and Lifecare Centers of America had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

55.     Facility had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

56.     No individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

57.     Transactions directed by Facility and Lifecare Centers of America, left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

**LEGAL BASIS FOR LIFECARE CENTERS OF AMERICA'S LIABILITY**

58.     Facility and Lifecare Centers of America, are referred to herein as the "Corporate Defendants."

59.     The Corporate Defendant directed, operated, and managed the day-to-day functions of their nursing facilities – including the Facility – by developing and implementing policies, practices and procedures affecting all facets of the Facility, including resident care.

60.    These policies manipulate and control the physical and financial resources and prohibit decision making at the Facility level.

61.    This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

62.    These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of the Facility's residents.

63.    The Corporate Defendant affirmatively chose and decided to establish such operations and demand they be implemented.

64.    Such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the Facility's staff.

65.    The Corporate Defendant consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

### Direct Participation/Individual Actions

66.    The Corporate Defendant was always material to this lawsuit in the business of managing, owning, and operating a network of nursing homes throughout the State of Kansas. One such nursing home was the Facility where Resident was admitted for care and treatment.

67.    At all times material to this lawsuit, the Corporate Defendant was fully aware that the delivery of essential care services in each of their nursing homes – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

68.    At all times material, the Corporate Defendant made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures.  More particularly, the Corporate Defendant determined:

> a.    The number of staff allowed to work in their chains of nursing homes including the Facility;
>
> b.    The expenditures for staffing at the nursing homes including the Facility;
>
> c.    The revenue targets for each nursing home including the Facility;

    d.   The payor mix, and census targets for each nursing home including the Facility;

    e.   Patient recruitment programs and discharge practices at each nursing home including the Facility.

69.    All cash management functions, revenues and expenditure decisions at the nursing home level – including the Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

70.    It was the choices made by the Corporate Defendant which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

71.    The Corporate Defendant formulated, established, and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

72.    The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendant was implemented and such application was carefully supervised and enforced.

73.    Following the mandates, the Facility functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendant deemed appropriate.

74.    Accordingly, such manipulation by the Corporate Defendant as to staffing and census were motivated by the financial needs of the Corporate Defendant and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

75.     Instead of abiding by their duty to care for the residents, the Corporate Defendant chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

76.     The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

77.     At the same time, the Corporate Defendant chose to design, create, implement, and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

78.     In so doing, the Corporate Defendant disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Facility, by the State of Kansas, and the federal government.

**Corporate Malfeasance**

79.     The Corporate Defendant consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

80.     Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

81.    These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Kansas and federal government imposed upon the Corporate Defendant and the Facility.

82.    Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury.  This negligence and resulting injuries ultimately led to and caused Resident's injuries as described above.

83.    During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, because of the acts, omissions, decisions, and choices made by the Corporate Defendant in operating the Facility.

84.    During Resident's residency at the Facility, the Corporate Defendant negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, because of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died because of this failure.

85.    The Corporate Defendant manage, operate, and direct the day-to-day operations of the Facility and these Corporate Defendant are liable for this direct involvement in the operations of such Facility. These Corporate Defendant are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

86.    The Facility and these Corporate Defendant have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

    a.    Chosen to disregard the duties and responsibilities which the Facility, as a licensed nursing home, owed to the State of Kansas and its residents;

    b.    Created the dangerous conditions described by interfering with and causing the Facility to violate Kansas statutes, laws and minimum regulations governing the operation of said nursing home;

    c.    Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management, and day to day operation of the Facility;

    d.    Caused the harm complained of herein; and

    e.    Choosing to disregard the contractual obligations owed to the State of Kansas and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

### Count I - (Wrongful Death)

87.    Plaintiff, in her individual capacity, incorporates by reference the allegations previously set forth and further alleges as follows:

88.    At all times material hereto Resident was in a defenseless and dependent condition.

89.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

90.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

91.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

92.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

93.    These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

94.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

95.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

96.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

   a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's condition;

   b. Failing to adequately assess Resident's risk of choking;

   c. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

d. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

e. Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding diet or choking prevention;

f. Failing to provide adequate assistive devices and interventions to prevent Resident's choking;

g. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for choking;

h. Failing to provide adequate assistance and assistive devices to prevent Resident's choking;

i. Failing to utilize proper procedures for preventing choking;

j. Failing to adequately assess, monitor, ensure, and document the administration of adequate hydration to Resident;

k. Failing to prevent the development and worsening of Resident's choking;

l. Failing to timely report Resident's changes in condition to a physician;

m. Failing to carry out the instructions of Resident's physician;

n. Failing to adequately, timely and consistently prevent, assess, and treat Resident's condition or risk of choking;

o. Failing to timely transfer Resident to a Facility that could provide adequate care;

p. Failing to properly supervise and train the employees of the Defendants who were responsible for the care and treatment of Resident;

q. Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's choking;

r. Failing to ensure the nursing home was properly capitalized.

s. Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

97.    As a direct and proximate result of the Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at Facility,

Resident was harmed and suffered including pain, suffering, and mental anguish, and death.

WHEREFORE, Plaintiff prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances.

## COUNT II - (Pain and Suffering by the Soon to Be Created Estate v. All Defendants)

98.     At all times material hereto Resident was in a defenseless and dependent condition.

99.     Due to her vulnerable and dependent condition, Resident relied on the defendants for her care and safety. The defendants had legal and professional obligations to:

      a. Standard of Care: provide skilled nursing care meeting professional standards; follow established nursing home care protocols; and protect vulnerable residents' safety and wellbeing.

      b. Specific Duties: implement and enforce proper care policies; maintain adequate staffing levels; hire qualified personnel; provide proper staff training and education; and ensure sufficient funding for resident care.

100.    These obligations applied to both The Corporate Defendants, and The Facility as the owners and operators of the nursing Facility, requiring them to meet professional standards of care for all residents, including Resident.

101.    During their care of Resident, The Corporate Defendants, The Facility, and their agents, servants, and/or employees failed to meet professional standards of care by failing to measure up to the requisite standard of care, skill, and practice

ordinarily exercised by members of their profession under the same or similar circumstances, including by through the following negligent acts:

    a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's condition;

    b. Failing to adequately assess Resident's risk of choking;

    c. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

    d. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

    e. Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding diet or choking prevention;

    f. Failing to provide adequate assistive devices and interventions to prevent Resident's choking;

    g. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for choking;

    h. Failing to provide adequate assistance and assistive devices to prevent Resident's choking;

    i. Failing to utilize proper procedures for preventing choking;

    j. Failing to adequately assess, monitor, ensure, and document the administration of adequate hydration to Resident;

    k. Failing to prevent the development and worsening of Resident's choking;

    l. Failing to timely report Resident's changes in condition to a physician;

    m. Failing to carry out the instructions of Resident's physician;

    n. Failing to adequately, timely and consistently prevent, assess, and treat Resident's condition or risk of choking;

    o. Failing to timely transfer Resident to a Facility that could provide adequate care;

    p. Failing to properly supervise and train the employees of the Defendants who were responsible for the care and treatment of Resident;

q.  Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's choking;

r.  Failing to ensure the nursing home was properly capitalized.

s.  Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

102.   As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

103.   At the time defendants caused and allowed Resident to suffer an avoidable choking incident, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees during 2022 and 2023 created a high degree of probability of injury to residents and consciously disregarded the safety of all residents including Resident.

WHEREFORE, Plaintiff (The Estate) prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including non-economic damages and past medical expenses.

**PLAINTIFF'S DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully Submitted,

STEELE LAW FIRM II, LLC

By:  */s/ Jonathan Steele*
Jonathan Steele KS #24852
Sabetha 2029 Wyandotte, Suite 100
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on June 26, 2025 a copy of the above and foregoing was forwarded for service to a Court appointed process server.

*/s/ Jonathan Steele*
Attorney for Plaintiff